26 F.3d 349
 24 Envtl. L. Rep. 21,224
 UNITED STATES of America, DEPARTMENT OF THE INTERIOR,
Plaintiff-Appellant,
v.
16.03 ACRES OF LAND, MORE OR LESS, LOCATED IN RUTLAND
COUNTY, VERMONT; Walter B. Nelson; Mary E. Nelson, Husband
and Wife; Treasurer Town of Shrewsbury, Vermont and Unknown
Others, Defendants-Appellees.
 No. 1318, Docket 92-6201.
 United States Court of Appeals,
Second Circuit.
 Argued March 8, 1994.
Decided June 14, 1994.
 
 Jacques B. Gelin, Washington, DC (Robert L. Klarquist, on the brief), U.S. Dept. of Justice (Lois J. Schiffer, Acting Asst. Atty. Gen., Charles R. Tetzlaff, U.S. Atty., Christopher B. Baril, Asst. U.S. Atty., James B. Snow, Eric C. Olson and Michael M. Tiernan, of counsel), for plaintiff-appellant.
 Peter W. Hall, Rutland, VT (Shannon A. Bertrand on the brief), for defendants-appellees Walter B. and Mary E. Nelson.
 Before: WALKER and JACOBS, Circuit Judges, and CARMAN, Judge.*
 CARMAN, Judge:
 
 I. Background
 
 1
 A. The National Trails System Act and Amendments
 
 
 2
 This appeal arises from a condemnation proceeding initiated by the Secretary of the Interior (Secretary) for the purpose of acquiring 16.03 acres of land in the Town of Shrewsbury, Vermont for the Appalachian National Scenic Trail (Appalachian Trail). The Appalachian Trail is one of several national scenic trails that Congress created under the National Trails System Act (Trails Act). See generally National Trails System Act, Pub.L. No. 90-543, 1968 U.S.C.C.A.N. (82 Stat.) 919 (codified as amended 16 U.S.C. Secs. 1241-1251). "The Appalachian Trail is a footpath for use by hikers which extends from Mount Katahdin in Maine to Springer Mountain in Georgia. The trail runs through 14 states and extends approximately 2,100 miles." United States v. 13.10 Acres of Land, 737 F.Supp. 212, 213 n. 1 (S.D.N.Y.1990).
 
 
 3
 In promulgating the Trails Act, Congress charged the Secretary with the primary responsibility of administering the Appalachian Trail. 16 U.S.C. Sec. 1244(a)(1). Consistent with this authority, the Secretary may, among other things, purchase land from private landowners, exchange federally-held lands for privately-held lands, and acquire privately-held lands through condemnation proceedings. See 16 U.S.C. Sec. 1246(e)-(g) (1988).
 
 
 4
 In 1978, Congress amended the Trails Act in order to "provide additional authority and direction to the Secretary of the Interior to insure the protection of the Appalachian Trail." S.REP. NO. 636, 95th Cong., 2d Sess. 3 (1978), reprinted in 1978 U.S.C.C.A.N. 456, 457; see generally Trails Act Amendments, Pub.L. No. 95-248, 92 Stat. 159. The Senate Report accompanying the amendments identifies the various concerns which prompted the legislation:
 
 
 5
 Over 650 miles of the Trail remain in private hands and changes in ownership and increasing pressures for development pose threats to the continuity of the Trail in numerous places. Approximately 180 additional miles of the Trail are now located along roads, providing no real hiking experience, but only a link between disconnected segments of the Trail. Some of these miles of road designation are the result of the Trail having been forced off a parcel of land due to a change in use or ownership.
 
 
 6
 The Department of the Interior has recognized this increasing threat to the Trail, and is preparing a detailed acquisition plan to carry out the mandate of the 1968 act to protect the Trail. Experience with the Trail has demonstrated, however, that additional authority is needed to insure the acquisition of a corridor sufficient to protect trail values. Similarly, an increase in the funding authorized for the Trail will be necessary to purchase a sufficient route through the areas which are now unprotected.
 
 
 7
 S.REP. NO. 636 at 3-4, reprinted in 1978 U.S.C.C.A.N. at 457-58. Among other things, the 1978 amendments (1) increased the amount of land the Secretary could condemn from an average of 25 acres per mile to the current 125 acres per mile and (2) expanded the budget available for land acquisitions from a total of $5,000,000 to $30,000,000 for each of the fiscal years 1979 through 1981. Trails Act Amendments, Pub.L. No. 95-248, Secs. 4, 5(a)(1), 92 Stat. 160 (codified as amended at 16 U.S.C. Secs. 1246(g), 1249(a)(1)).
 
 B. District Court Proceedings
 
 8
 On September 7, 1990, the government filed its Complaint in Condemnation (Complaint) and Notice in Condemnation (Notice) in the United States District Court for the District of Vermont. As is material to this appeal, the Complaint and Notice contain the following: (1) the coordinates of the parcel of land consisting of "16.03 acres, more or less" the government sought to acquire in fee simple; (2) a description of ownership identifying appellee Walter B. Nelson "et ux " as the owners of the parcel; and (3) a summary of the public purposes prompting the condemnation, including the "proper administration, preservation, and development of the Appalachian National Scenic Trail...."
 
 
 9
 On February 21, 1991, appellees filed an Amended Answer in response to the government's Complaint and Notice. The essence of appellees' Amended Answer was that the government wrongfully sought to condemn 4.46 of the proposed 16.03 acres in fee instead of acquiring an easement for the 4.46 acres. Appellees claimed negotiations with the government contemplated "a taking in fee of 11.57 acres and a taking by way of easement of 4.46 acres" and the government's compensation award for the taking reflected these amounts. Appellees argued the government decided to condemn all 16.03 acres in fee only after appellees refused to accept the government's compensation award. According to appellees, the award improperly excluded compensatory and severance damages for which the government had promised it would account in making the award. Appellees asserted the government's decision to condemn all 16.03 acres in fee was "vindictive, arbitrary and capricious" and resulted from the government's bad faith actions. In sum, appellees maintained the government's acquisition of 4.46 of the proposed 16.03 acres in fee instead of by easement was an invalid taking under the Fifth Amendment, was unnecessary to comply with 16 U.S.C. Sec. 1246(g), and exceeded the amount of land that was " 'reasonably necessary to provide passage across' [appellees'] lands." Consequently, appellees sought an order from the district court to (1) dismiss the government's Complaint or amend the Complaint and Notice to include a smaller parcel suggested by appellees; (2) amend the Complaint and Notice so as to limit the condemnation to "such acreage as will comprise that width of corridor reasonably necessary to provide passage across [appellees'] lands which will protect the integrity of the trail;" or (3) amend the Complaint and Notice so that the government would acquire 11.57 acres in fee and 4.46 acres by an easement.
 
 
 10
 After conducting a one-day trial, the district court found the government failed to demonstrate "by a preponderance of the evidence that it [was] reasonably necessary" to condemn the 16.03 acres the government sought. United States v. 16.03 Acres of Land, No. 90-251, slip op. at 4 (D.Vt. March 12, 1992). The court indicated the government could take "only the minimal interest in land that will accommodate the protection of the trail and passage across lands, having in mind a minimum impact on the landowner by the taking." Id. The court found the 16.03 acres were "not necessary to protect the passage of the trail" and concluded the evidence presented and concessions by defendants demonstrated the condemnation of 6.7 acres was "reasonably necessary." Id. at 5.
 
 II. CONTENTIONS OF THE PARTIES
 
 11
 On appeal, the government raises several arguments. First, the government argues the Secretary's decision as to the amount of land to condemn for the Appalachian Trail is not judicially reviewable because such a decision is committed to the Secretary's discretion by law. According to the government, the only matter subject to review was whether the amount of land that the Secretary sought to condemn exceeded the statutory limit of an average of 125 acres per mile. Second, assuming the Secretary's decision is subject to judicial review, the government maintains the district court failed to accord the Secretary the deference mandated by applicable statutory and case law. Moreover, the government contends the district court improperly placed the burden of proving the Secretary did not abuse his discretion on the Secretary. In addition, the government asserts the district court had no factual basis for concluding the Secretary abused its discretion.
 
 
 12
 Appellees oppose the government's position on three grounds. First, appellees contend the government waived any objection to the reviewability of the Secretary's decision when it failed to raise the issue before the district court. Second, appellees claim the district court properly concluded the Secretary's decision to condemn 16.03 acres was arbitrary and capricious because the government's own witness conceded a lesser quantity of land and a lesser fee would have satisfied the applicable statutory standards. Finally, as the district court based its conclusion on testimony provided by the government's own witness, appellees argue the court did not substitute its own judgment for that of the Secretary.
 
 III. DISCUSSION
 A. Judicial Review
 
 13
 Appellees first suggest the government waived its claim that the Secretary's decision to condemn appellees' property was unreviewable. As indicated above, the government bases this claim on the premise that the Secretary's decision was one "committed to agency discretion by law." We note, however, the government consented to the fact-finding proceedings in the district court without first raising its argument that the Secretary's decision was not subject to judicial review. Indeed, the first mention of it appeared in the government's post-trial brief. Regardless of when the government raised the matter, because a question pertaining to the scope of judicial review is a significant and purely legal issue, we will address the government's contention that the Secretary's condemnation decision pursuant to 16 U.S.C. Sec. 1246(g) is unreviewable. See Austin v. Healy, 5 F.3d 598, 601 (2d Cir.1993) (noting the court's "considerable discretion to decide questions not raised initially in the district court") (citation omitted).
 
 
 14
 We turn next to the substantive question of whether the Secretary's condemnation decision pursuant to 16 U.S.C. Sec. 1246(g) is subject to judicial review. The resolution of this question necessitates two distinct inquiries. First, we must determine whether the courts have the authority to review the Secretary's condemnation decision. Second, assuming such authority exists, we must then define the standard of review that applies to the decision. We consider each of these questions in turn.
 
 1. Authority for Judicial Review
 
 15
 Our review of the case law from this circuit and our sister circuits indicates no appellate court has considered whether the courts have the authority to review condemnation decisions pursuant to 16 U.S.C. Sec. 1246(g). With respect to the district courts, only one unpublished opinion appears to have reached the issue. See United States v. 4.70 Acres of Land, No. 88-1876 (M.D.Pa. April 19, 1989), construed in United States v. 18.67 Acres, 793 F.Supp. 582, 587 (M.D.Pa.1992) (noting Sec. 1246(g) allows only a "very narrow scope of review" and indicating the section precludes "defenses challenging the extent of the estate 'taken' " in a Sec. 1246(g) condemnation); but see United States v. 13.10 Acres of Land, 737 F.Supp. 212, 218 (S.D.N.Y.1990) (assuming without deciding that a taking pursuant to Sec. 1246(g) is subject to judicial review for the purpose of determining whether the Secretary acted arbitrarily or capriciously).
 
 
 16
 Our resolution of the issue begins with the fundamental principle that "[w]hen Congress passes an Act empowering administrative agencies to carry on governmental activities, the power of those agencies is circumscribed by the authority granted." Stark v. Wickard, 321 U.S. 288, 309, 64 S.Ct. 559, 570, 88 L.Ed. 733 (1944). It is equally well-established that "there is no place in our constitutional system for the exercise of arbitrary power, and, if the Secretary has exceeded the authority conferred upon him by law, then there is power in the courts to restore the status of the parties aggrieved by such unwarranted action." Garfield v. United States, 211 U.S. 249, 262, 29 S.Ct. 62, 66, 53 L.Ed. 168 (1908). Consequently, "[t]he courts, when a case or controversy arises, can always 'ascertain whether the will of Congress has been obeyed,' Yakus v. United States, 321 U.S. 414, 425, 64 S.Ct. 660, 667, 88 L.Ed. 834 (1944), and can enforce adherence to statutory standards." INS v. Chadha, 462 U.S. 919, 953 n. 16, 103 S.Ct. 2764, 2785 n. 16, 77 L.Ed.2d 317 (1983) (citing Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 585, 72 S.Ct. 863, 865, 96 L.Ed. 1153 (1952)) (other citations omitted). Judicial review of the exercise of congressionally-delegated authority exists in recognition of the fact that "a delegation of power implies some limit [and a]ction beyond that limit is not legitimate." LOUIS L. JAFFE, JUDICIAL CONTROL OF ADMINISTRATIVE ACTION 320 (1965).
 
 
 17
 Several courts have recognized these limitations in connection with an agency's ability to exercise congressionally-delegated eminent domain powers. In reviewing challenges to the exercise of these powers, some courts have tailored their analysis to considering whether government officials acted within their statutory limits. See Catlin v. United States, 324 U.S. 229, 240, 65 S.Ct. 631, 637, 89 L.Ed. 911 (1945) (indicating a landowner whose property is the subject of a taking may "challenge the validity of the taking for departure from the statutory limits"); Maiatico v. United States, 302 F.2d 880, 886 (D.C.Cir.1962) (holding the General Services Administration condemned property outside the statutorily-designated "taking area" and, therefore, acted without authority). Other decisions have analyzed disputed condemnations in terms of whether the government officials effecting the condemnation acted arbitrarily, capriciously, or in bad faith. See United States v. Carmack, 329 U.S. 230, 243, 67 S.Ct. 252, 258, 91 L.Ed. 209 (1946) (noting a reviewing court may set aside a decision to condemn a parcel of property "as unauthorized by Congress if the designated officials had acted in bad faith or so 'capriciously and arbitrarily' that their action was without adequate determining principle or was unreasoned") (footnote omitted); United States v. 1.33 Acres, 9 F.3d 70, 73 (9th Cir.1993) (considering whether the condemnation decision at issue was "arbitrary, capricious, or" made in bad faith). Regardless of the terminology employed by the reviewing courts in the foregoing cases, they clearly indicate condemnation decisions are subject to judicial review. We hold, therefore, that condemnation decisions by governmental entities to which Congress has delegated eminent domain authority are subject to judicial review.
 
 2. Standard of Review
 
 18
 Although case law preponderates in favor of subjecting condemnation decisions to judicial review, the precise standard of review that the courts should apply to such decisions is unclear. As suggested by the court's previous discussion, the cases in which the courts have reviewed condemnation decisions generally employ one of two standards of review. The first standard, which may be described as an "ultra vires" standard,[1] requires the reviewing court to examine the challenged taking for the purpose of determining whether the officials effecting the taking acted outside the scope of their taking authority. See Catlin, 324 U.S. at 240, 65 S.Ct. at 637; Maiatico, 302 F.2d at 886. Other cases use an "arbitrary, capricious, or bad faith" standard of review to assess the validity of a contested taking. See Carmack, 329 U.S. at 243-48, 67 S.Ct. at 258-60; 1.33 Acres, 9 F.3d at 73; United States v. 101.88 Acres of Land, 616 F.2d 762, 767 (5th Cir.1980). Still others appear to apply both the "ultra vires" standard and the "arbitrary, capricious, or bad faith" standard. See United States v. 58.16 Acres of Land, 478 F.2d 1055, 1059 (7th Cir.1973); United States v. 2606.84 Acres of Land, 432 F.2d 1286, 1290 (5th Cir.1970), cert. denied, 402 U.S. 916, 91 S.Ct. 1368, 28 L.Ed.2d 658 (1971); United States v. 2.9 Acres of Land, 554 F.Supp. 529, 531 (D.Mont.1982).
 
 
 19
 These two standards, however, are clearly distinct. On the one hand, the "ultra vires" standard requires the reviewing court to ascertain the scope of the acting officials' statutory authority and determine whether the officials' action conformed with their authority. Such authority may be broad or narrow depending upon the language employed in the empowering legislation. Similar to the role the courts play in interpreting contracts, the courts' role in applying the "ultra vires" standard is limited to examining the four corners of the statute that gives the officials the power to act and determining whether the officials have complied with the statute's language. On the other hand, the "arbitrary, capricious, or bad faith" standard necessitates an analysis of the manner in which the officials exercised their authority.
 
 
 20
 Despite the fact that the "ultra vires" and "arbitrary, capricious, or bad faith" standards are dissimilar, some courts have merged the divergent inquiries each requires. See, e.g., Carmack, 329 U.S. at 243, 67 S.Ct. at 258 ("In this case, it is unnecessary to determine whether or not this selection could have been set aside by the courts as unauthorized by Congress if the designated officials had acted in bad faith or so 'capriciously and arbitrarily' that their action was without adequate determining principle or was unreasoned.") (footnote omitted); 58.16 Acres of Land, 478 F.2d at 1058-59 (concluding the district court erred by not considering whether officials acted arbitrarily, capriciously, or in bad faith to decide whether taking was for authorized purpose); 2606.84 Acres of Land, 432 F.2d at 1290 (examining whether officials acted arbitrarily, capriciously, or in bad faith in order to determine whether taking conformed with statutory purpose); 2.9 Acres of Land, 554 F.Supp. at 531 (considering whether officials acted arbitrarily, capriciously, or in bad faith to determine whether they exceeded the limits of their condemnation authority). The reasoning underlying these cases appears to proceed on the premise that officials charged with eminent domain powers act outside the scope of their statutory authority when they undertake a condemnation in bad faith, or in an arbitrary or capricious manner.
 
 
 21
 Such a premise, however, is questionable because it blurs the distinctions noted previously with respect to the "ultra vires" and "arbitrary, capricious, or bad faith" standards of review. While we do not condone arbitrary, capricious, or bad faith conduct, the mere fact that delegated officials exercise their statutory condemnation power arbitrarily, capriciously, or in bad faith does not necessarily establish they have exceeded their authority. To equate arbitrary, capricious, or bad faith conduct with actions that lack legal authority improperly consolidates two distinct inquiries into one and obfuscates the courts' proper role in reviewing actions taken pursuant to congressionally-delegated authority to condemn property. Cf. JAFFE, JUDICIAL CONTROL OF ADMINISTRATIVE ACTION 265-66 (analyzing the courts' use of the "abuse of discretion" standard and noting that rationalizing "each and every 'abuse of discretion' in terms of lack of statutory authority no doubt makes for systematic simplicity, ... [b]ut it adds little of substance"). Because we believe the ultimate question the courts must decide in reviewing such action in the eminent domain context is whether the delegated officials acted in conformity with their legislative grant of authority, we conclude the courts should apply the "ultra vires" standard of review.
 
 
 22
 Nevertheless, a determination that the Secretary acted in accordance with his statutory authority does not end the reviewing court's inquiry. Even after the court concludes the Secretary conformed to his legislative grant of authority, the court may still consider the manner in which he exercised that authority. Such a consideration requires the reviewing court to determine whether the Secretary acted arbitrarily, capriciously, or in bad faith. The purpose of such an inquiry, however, is not to determine whether the Secretary conformed to his statutory authority, but rather whether he abused his authority. The distinction noted is analogous to the difference appearing in the inquiries required in cases reviewing administrative action falling under the Administrative Procedure Act (APA).[2] Compare 5 U.S.C. Sec. 706(2)(C) (1988) (requiring the reviewing court to "hold unlawful and set aside agency action, findings, and conclusions found to be ... in excess of statutory jurisdiction, authority, or limitations, or short of statutory right") and 5 U.S.C. Sec. 706(2)(A) (1988) (requiring the reviewing court to "hold unlawful and set aside agency action, findings, and conclusions found to be ... arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law").
 
 
 23
 Similar to the review required under 5 U.S.C. Sec. 706(2)(A) in the APA context, the courts' role in reviewing the Secretary's action for arbitrariness, caprice, or bad faith is limited. The courts may only ascertain whether the Secretary based his decision on a consideration of the relevant statutory factors and may not substitute their own judgment for that of the Secretary. See Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971). Under this standard, a reviewing court may only set aside a takings decision as being arbitrary, capricious, or undertaken in bad faith in those instances where the court finds the Secretary's conduct so egregious that the taking at issue can serve no public use. See 101.88 Acres of Land, 616 F.2d 762, 767 (indicating the determination as to whether a taking has occurred for a public use may depend upon whether "authorized officials were acting in bad faith or arbitrarily or capriciously by condemning given land").
 
 
 24
 In this case, the boundaries limiting the Secretary's condemnation authority clearly appear in 16 U.S.C. Sec. 1246(g). This statute reads as follows:
 
 
 25
 The Appropriate Secretary may utilize condemnation proceedings without the consent of the owner to acquire private lands or interests therein pursuant to this section only in cases where, in his judgment, all reasonable efforts to acquire such lands or interests therein by negotiation have failed, and in such cases he shall acquire only such title as, in his judgment, is reasonably necessary to provide passage across such lands: Provided, That condemnation proceedings may not be utilized to acquire fee title or lesser interests to more than an average of one hundred and twenty-five acres per mile.
 
 
 26
 Sec. 1246(g) (emphasis in original). The restrictions created by the foregoing language provide a basis for measuring the Secretary's actions for conformity to his legislative grant.
 
 
 27
 The first restriction created by Sec. 1246(g) is that the Secretary must enter into land acquisition negotiations before exercising his eminent domain powers. The inclusion of the term "only" following the grant of condemnation authority effectively makes land acquisition negotiations a condition precedent to the exercise of that authority. See S.REP. NO. 636 at 5, reprinted in 1978 U.S.C.C.A.N. at 459 ("[T]he expectation of the committee is that eminent domain will continue to be used as a tool of last resort for the Trail" after land acquisition negotiations have failed.). The Secretary is simply not free to invoke his eminent domain authority without first attempting to purchase the land in question. The fact that the statute gives the Secretary discretion in deciding when "all reasonable efforts to acquire ... lands or interests therein by negotiation have failed" does not alter the statute's mandate that the Secretary enter into land acquisition negotiations before exercising his eminent domain powers. Nevertheless, the negotiation requirement is itself limited to the extent that Congress has expressly vested the Secretary with the discretion to determine when negotiations are fruitless. Despite this discretion, a court could properly conclude the Secretary acted without authority if the evidence presented demonstrated the Secretary either never attempted to negotiate with a landowner or negotiated in such bad faith that he effectively failed to satisfy the negotiation condition before condemning the property.
 
 
 28
 The second restriction in Sec. 1246(g) limits the amount of title the Secretary may acquire through condemnation. Specifically, the statute only permits the Secretary to "acquire only such title as, in his judgment, is reasonably necessary to provide passage across such lands." In this context, as with the negotiation requirement, the use of the term "only" in connection with the title the Secretary may acquire denotes a limitation. While this limitation is more ambiguous than the negotiation requirement, it nevertheless suggests the Secretary must make a reasoned determination as to the title that is "necessary to provide passage." The fact that the statute gives the Secretary discretion does not negate the separate requirement that the Secretary make a reasoned determination as to the amount of title he needs to acquire. Nevertheless, as noted in connection with the negotiation requirement, the Secretary's discretion does not preclude the courts from considering whether the Secretary acted within the scope of his authority. A conclusion that the Secretary acted outside the scope of his authority, however, requires proof that he either failed to make any determination as to the amount of title that is "necessary to provide passage" or made a determination in such bad faith that he effectively failed to satisfy the "determination" requirement before condemning the property.
 
 
 29
 The third restriction contained in Sec. 1246(g) limits the amount of land that the Secretary may condemn to "an average of acres per mile." As explained in the legislative history of the Trails Act, "[w]hile the language of the act enables the Secretary to average the land acquisitions within each mile of the trail, it explicitly precludes him from averaging out the acquisition of lands over extended sections of the trail." H.REP. NO. 1631, 90th Cong., 2d Sess. ---- (1968), reprinted in 1968 U.S.C.C.A.N. 3855, 3858. The foregoing passage reveals a calculated decision by Congress to curtail the Secretary's taking authority with respect to the amount of land he may condemn. Despite this proscription, however, nothing in the statute prohibits the Secretary from condemning up to "an average of acres per mile." Consequently, this limitation provides landowners with a limited remedy. A landowner may rely on this limitation to demonstrate the Secretary has exceeded his authority only to the extent that (1) the condemnation of the landowner's property would cause the total amount of condemned property to surpass the 125 acres per mile average or (2) the Secretary has already surpassed the 125 acres per mile average before condemning the landowner's property. Where a landowner cannot make either of these showings and the Secretary has satisfied the two other restrictions discussed previously, we believe the broad discretion granted to the Secretary for condemning land up to "an average of acres per mile" bars the courts from disturbing the Secretary's condemnation on the grounds that he condemned too much property. Having defined the proper standard for reviewing the Secretary's condemnation decisions, we turn next to the district court's decision.
 
 B. The District Court's Decision
 1. Standard of Review
 
 30
 This court will uphold the district court's findings unless they are clearly erroneous. Harrison v. Grobe, 984 F.2d 594, 595-96 (2d Cir.1993) (citing FED.R.CIV.P. 52(a)). "[A] 'finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.' " Bose Corp. v. Consumers Union of United States, Inc., 466 U.S. 485, 499, 104 S.Ct. 1949, 1958, 80 L.Ed.2d 502 (1984) (quoting United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 541, 92 L.Ed. 746 (1948)) (emphasis in original).
 
 2. The Condemnation
 
 31
 The record in this case indicates the district court misconstrued its function in reviewing the Secretary's condemnation. As noted previously, the district court described its reasoning as follows:
 
 
 32
 One must attempt to take only the minimal interest in land that will accommodate the protection of the trail and passage across lands, having in mind a minimum impact on the landowner by the taking. It is the burden of the government to show by a preponderance of the evidence that it is reasonably necessary for these purposes to take the land or interest herein.
 
 
 33
 United States v. 16.03 Acres of Land, No. 90-251, slip op. at 4. After finding the 16.03 acres the Secretary sought were "not necessary to protect the passage of the trail," the court determined the evidence presented and concessions by defendants demonstrated the condemnation of 6.7 acres was "reasonably necessary." Id. at 5. We conclude the district court's findings are clearly erroneous because they depend upon a misapplication of the statutory standards that govern condemnations made pursuant to Sec. 1246(g) and upon evidence that is irrelevant in actions challenging such condemnations.
 
 
 34
 We turn first to the "minimal interest" standard employed by the district court. We find such a standard imposes limitations on the Secretary's authority that have no basis in statutory or case law. In short, nothing in Sec. 1246(g) or any other provision of the Trails Act suggests, as the district court assumed, the Secretary can only condemn "the minimal interest in land that will accommodate the protection of the trail and passage across lands, having in mind a minimum impact on the landowner by the taking." See id. As discussed previously with respect to the amount of title or property the Secretary may condemn, the only limitations on the Secretary's authority are (1) he must enter into land acquisition negotiations before exercising his authority, (2) he must make a reasoned determination as to the title that is "necessary to provide passage," and (3) he cannot condemn more than "an average of acres per mile." See Sec. 1246(g). Consequently, so long as the Secretary negotiates with the landowner whose property he wants to acquire, makes a reasoned determination as to the title that is "necessary to provide passage," and does not condemn an amount of property in excess of "an average of acres per mile," he has no other limitations. Accordingly, we conclude the premise underlying the district court's decision that the Secretary is limited to any kind of "minimal interest" is groundless.
 
 
 35
 We hold the district court's "minimal interest" standard conflicts with the manifest purpose of the Trails Act Amendments of 1978. As noted previously, Congress amended the Trails Act in order to "provide additional authority and direction to the Secretary of the Interior to insure the protection of the Appalachian Trail." S.REP. NO. 636 at 3 (1978), reprinted in 1978 U.S.C.C.A.N. at 457. To accomplish these goals, the legislature expanded the Secretary's eminent domain authority and increased his budget for land acquisitions. See Trails Act Amendments, Pub.L. No. 95-248, Secs. 4, 5(a)(1), 92 Stat. 160 (codified as amended at 16 U.S.C. Secs. 1246(g), 1249(a)(1)). Contrary to Congress' express interest in augmenting the Secretary's authority, the district court's "minimal interest" standard creates a new impediment on the Secretary's ability to protect the trail by limiting the amount of land he may take. In short, because the amendments sought to bolster the Secretary's condemnation authority under the Act and worked in tandem with the Secretary's well-defined discretion in implementing the Act, we find no basis for applying the "minimal interest" standard that the district court adopted.
 
 
 36
 In addition, we find the court improperly modified the statutorily-prescribed criteria set forth in Sec. 1246(g) by making the impact that a condemnation might have on a property owner another factor that the Secretary must consider. While we do not suggest the Secretary should ignore the impact of his condemnation decisions, nothing in the text of the Trails Act, the Trails Act Amendments, or the statutes' legislative history indicates Congress intended to make this kind of impact a factor that must guide the Secretary's decisions. Consequently, we find the district court erred in considering this factor in reviewing the Secretary's decision.
 
 
 37
 We turn next to the evidence upon which the district court's opinion relies. This evidence consisted of the testimony of appellee Walter B. Nelson and the testimony of the government's realty officer in charge of land acquisitions for the Appalachian Trail. Specifically, the district court relied upon Mr. Nelson's concession that seven acres were "reasonably necessary" for the government's condemnation and the government witness' testimony that the government would have accepted 10.95 acres in fee from appellees. See 16.03 Acres of Land, No. 90-251, slip op. at 2-3, 5; Tr. at 39-40, 69.
 
 
 38
 We believe such evidence provides an inadequate basis for concluding the Secretary could only condemn 6.7 acres of the 16.03 acres he originally sought. In short, we find Mr. Nelson's testimony concerning the amount of property that he conceded was "reasonably necessary" to be simply irrelevant. The plain language of Sec. 1246(g) precludes consideration of such testimony because it places the determination of the amount of property that is "reasonably necessary" in the province of the Secretary alone. Relying on what a landowner perceives to be "reasonably necessary" improperly deflects the statute's focus away from the Secretary and onto the landowner. While a landowner's testimony may be relevant for the purpose of determining whether the Secretary ran afoul of Sec. 1246(g)'s limitations, the district court did not use the testimony for this purpose. Instead, the court substituted Mr. Nelson's concession as to the amount of property that is "reasonably necessary" to satisfy the statutory purpose for the Secretary's determination on this question. Contrary to appellees' position, the fact that the amount of property the district court ultimately decided was "reasonably necessary" differed from Mr. Nelson's concession by only three-tenths of an acre and was four and one-quarter acres less than the amount suggested by the government's witness clearly shows the district court relied on Mr. Nelson's testimony. As Congress has unequivocally given the Secretary the discretion to decide how much property he needs to condemn to satisfy the statutory purpose and Mr. Nelson's concession does not tend to show the Secretary exceeded his statutory authority, we can discern no basis for giving any weight to Mr. Nelson's testimony in this case.
 
 
 39
 The district court's reliance on the government's witness' testimony was also improper. In essence, the mere fact that a government witness testifies the government would have accepted a parcel of land that is smaller than the parcel the government seeks in its complaint in condemnation does not demonstrate the government is not entitled to the amount identified in its complaint. As noted above, the Secretary must enter into land acquisition negotiations before exercising his eminent domain powers. It is only after the Secretary determines such negotiations are futile that he can invoke his condemnation authority. Where, as here, negotiations prove futile, the Secretary is then free to condemn the amount of title and property he deems "reasonably necessary" to fulfill the statutory purpose. The ultimate decision as to the amount of title and property clearly does not occur in a vacuum. Common sense dictates the decision will depend upon the needs the Secretary perceives, the realities revealed in his negotiations with the landowners, and the applicable statutory guidelines. As a result, we believe it is improper to use the testimony of a single government witness as to what that witness believes is "reasonably necessary" as a barometer of what the Secretary believes is "reasonably necessary." Although such testimony may reflect the belief of the witness, it does not follow that a reviewing court may seize upon it as the actual position of the Secretary with respect to a challenged condemnation and disregard the Secretary's position as it appears in his complaint in condemnation.
 
 
 40
 In sum, the errors committed by the district court with respect to the legal standard applicable to the Secretary's condemnation decisions and the evidence upon which the court relied compel us to conclude the court's findings are manifestly erroneous. Moreover, because nothing on the record suggests the Secretary violated the statutory guidelines contained in Sec. 1246(g), we hold his decision to condemn 16.03 acres in fee was proper. A remand is necessary in this case, however, for the sole purpose of determining the fair and just compensation to which appellees are entitled for the taking of the 16.03 acres in fee.
 
 IV. CONCLUSION
 
 41
 The district court's judgment in favor of appellees is reversed and the case is remanded to allow the district court to determine the amount of compensation the government must pay to acquire the 16.03 acres in question.
 
 
 
 *
 Honorable Gregory W. Carman, of the United States Court of International Trade, sitting by designation
 
 
 [1]
 The courts generally apply the term "ultra vires " to any action taken without authority. See, e.g., U.S. East Telecommunications, Inc. v. U.S. West Info. Sys., Inc., 15 F.3d 261, 263 (2d Cir.1994) (describing as ultra vires the issuance of an amended scheduling order by the district court); DDI Seamless Cylinder Int'l, Inc. v. General Fire Extinguisher Corp., 14 F.3d 1163, 1165-66 (7th Cir.1994) (characterizing as ultra vires an attempt by a magistrate judge to arbitrate the parties' dispute); Moller-Butcher v. United States Dep't of Commerce, 12 F.3d 249, 252 (D.C.Cir.1994) (noting the Under Secretary of Commerce had the authority to review a decision of an administrative law judge (ALJ) and therefore did not act ultra vires in restoring the ALJ's decision)
 
 
 [2]
 We do not suggest the Administrative Procedure Act applies in the takings context